UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONTAY McMANN,

             Petitioner,                                  Hon. Richard Alan Enslen

v.                                                   Case No. 1:02-CV-403

GREG McQUIGGIN,

             Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on McMann's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that McMann's petition be **denied**.


**BACKGROUND**

        As a result of his alleged involvement in a robbery and murder, Petitioner was charged with felony murder, two counts of assault with the intent to commit murder, conspiracy to commit armed robbery, and three counts of possessing a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony is summarized below.

**Officer Arlene Orterry**

As of March 1, 1997, Officer Orterry was employed as a police officer for the City of Muskegon, working the 10 p.m. to 6 a.m. shift.  (Trial Transcript, Oct. 28, 1997, 148-49).  At some point during her shift that evening, Orterry was dispatched to the residence at 616 Apple Avenue to investigate a shooting.  (Tr. 149-50).  Upon entering the residence Orterry observed a black male laying on the floor bleeding.  (Tr. 150-51).  She also observed a large blood-covered bag of crack cocaine laying in the middle of the kitchen floor.  (Tr. 151).

Officer Orterry was then instructed to proceed to 1021 Kenneth Street because "the suspects were seen running in that direction."  (Tr. 151-52).  When she arrived at that location, she was directed to 1033 Kenneth Street, where she discovered Timothy Horton laying in the sidewalk, dead from gunshot wounds to the chest.  (Tr. 152-54).

**Officer Michael Addicott**

As of March 1, 1997, Officer Addicott was employed as a police officer for the City of Muskegon, working the 10 p.m. to 6 a.m. shift.  (Trial Transcript, Oct. 28, 1997, 162-63).  At approximately 11:20 p.m. that night, Addicott was instructed to proceed to 616 Apple Avenue to investigate a shooting.  (Tr. 163-65).  Upon arrival, Addicott observed that "the front door area and the glass had been shattered out."  (Tr. 165).  Addicott entered the residence and observed a black male who had been shot.  (Tr. 165-66).  Officer Addicott also observed crack cocaine on the floor.  (Tr. 166).

Addicott remained at the residence for approximately five minutes, before proceeding to 1021 Kenneth Street, which was located 50-75 yards away.  (Tr. 166-68, 178).  Officer Addicott

2

approached the residence from the rear, where he discovered a black female with a gunshot wound to the leg. (Tr. 168). Addicott subsequently observed a deceased black male laying in the driveway of 1033 Kenneth Street. (Tr. 169-70).

A few minutes later, after learning that a vehicle that might have participated in the shooting was observed nearby, Officer Addicott proceeded to Allen Street, which was located approximately 150 yards away. (Tr. 171-72). When he arrived at Allen Street, Addicott encountered a black man who informed him that "his old lady had been shot." (Tr. 171-73).

**Officer Jeff Geiger**

Officer Geiger was involved in the investigation of the March 1, 1997 shootings at 1021 Kenneth Street and 616 Apple Avenue. (Trial Transcript, Oct. 28, 1997, 181-82). As part of his investigation, Geiger went to the hospital where one of the shooting victims, Shataun Smith, was being treated. (Tr. 182). Officer Geiger observed that Smith's "left shin was basically blown apart" and that she was in "extreme" pain. (Tr. 182).

**Officer Keith Stratton**

Officer Stratton was involved in the investigation of the March 1, 1997 shootings at 1021 Kenneth Street and 616 Apple Avenue. (Trial Transcript, Oct. 28, 1997, 185). At the 616 Apple Avenue residence, Stratton observed a black man that had been shot. (Tr. 185-86). At the 1021 Kenneth Street residence, Stratton observed a female who had been shot. (Tr. 186). Stratton then proceeded to a location on Allen Street, where he encountered a black man who informed him that a female, who Stratton presumed was the man's wife or girlfriend, had been shot. (Tr. 187).

3

**Madaline Spinks**

Spinks testified that she knew two women named Selma Davis: (1) Selma Joy Davis (a.k.a. Big Selma) and (2) her daughter Selma Davis (a.k.a. Little Selma).  (Trial Transcript, Oct. 28, 1997, 188-90).  Spinks resided in Benton Harbor and the Davises resided in Muskegon.  (Tr. 189-90).  Spinks testified that she had known Big Selma for approximately ten years and the two used to visit "quite often."  (Tr. 189-90).

In March 1997, Big Selma informed Spinks that "something was going on here" and asked Spinks if Little Selma could stay with her "for a few days."  (Tr. 190, 193-96).  Spinks agreed and Little Selma stayed with Spinks for "about two to three weeks."  (Tr. 190-91).  During her stay with Spinks, Little Selma received telephone calls from Petitioner.  (Tr. 191-92).  At the conclusion of these telephone calls, Little Selma appeared "upset."  (Tr. 197).  Spinks testified that "the kids was saying" that Petitioner had been telling Little Selma that he was going to beat her up.  (Tr. 197).  Little Selma was eventually arrested by the police at Spinks' residence.  (Tr. 193).

**Q'eyanna Hersey**

Hersey testified that Madaline Spinks was her cousin.  (Trial Transcript, Oct. 28, 1997, 198-99).  Hersey met and socialized with Little Selma during the time that Little Selma stayed with Spinks.  (Tr. 199-200).  Hersey testified that during the time that the pair socialized, Little Selma often spoke on the telephone with Petitioner, who Hersey described as Little Selma's boyfriend.  (Tr. 200-01).  Hersey testified that while listening in on one of these conversations she heard Petitioner tell Little Selma that "she better get her ass back to Muskegon, and all that, or if she don't, he going to beat her ass."  (Tr. 203).  Hersey overheard another conversation in which

4

Petitioner told Little Selma that he would "pop her dead in the face." (Tr. 208). Hersey testified that Little Selma was scared of Petitioner. (Tr. 203).

Hersey was at Madaline Spinks' residence when Little Selma was arrested. (Tr. 205-06). After Little Selma's arrest, Madaline Spinks telephoned Petitioner to find out "what was going on." (Tr. 209). Petitioner responded that "some dudes got killed and somebody was trying to rob them." (Tr. 209). Petitioner indicated that he was present when the shooting and robbery occurred, but that he was not involved in the crime. (Tr. 209-10).

**Derrick Porter**

As of March 1997, Porter was renting the house at 1021 Kenneth Street. (Trial Transcript, Oct. 28, 1997, 214). Porter testified that during this period of time he knew Timothy Horton (a.k.a. Shorty), as well as another man who he knew only by the nickname "Face."[1] (Tr. 214-15). Shorty and Face occasionally sold crack cocaine from Porter's residence. (Tr. 215-16). Porter testified that Little Selma visited his house "several times" prior to March 1, 1997. (Tr. 236).

Porter was not at home on March 1, 1997, the day of the shootings. (Tr. 216-18). Porter spent the day in Grand Rapids and did not return home until the afternoon of March 2, 1997. (Tr. 221-23). Porter testified that he discovered numerous bullet holes in his residence when he returned home on March 2, 1997. (Tr. 218-21, 233). Porter testified that these bullet holes were not present when he departed for Grand Rapids on the morning of March 1, 1997. (Tr. 218-21, 233).

---

[1] Face was subsequently identified as Al Bailey. (Trial Transcript, Oct. 29, 1997, 60).

**Harold Rogers**

As of March 1, 1997, Rogers resided at 616 Apple Avenue.  (Trial Transcript, Oct. 29, 1997, 4-5).  Sometime "a little after" 11:00 p.m. that evening, Rogers was watching television when he heard five gunshots.  (Tr. 6-7).  Rogers testified that two of the shots appeared to have been fired from a "smaller caliber" weapon, whereas the other three shots were fired from a weapon "quite a bit larger" in caliber, possibly a "deer rifle."  (Tr. 7).  Rogers testified that these gunshots originated from the direction of Kenneth Street.  (Tr. 9).

After hearing these gunshots, Rogers walked to his dining room and asked his wife to telephone 911.  (Tr. 8-9).  After Rogers returned to the living room his dogs "alerted" and began "making a whole lot of noise."  (Tr. 10).  Rogers walked over to the picture window in his living room and observed a young black man running towards his house.  (Tr. 10-11).  Rogers immediately went to his front door to let the man in.  (Tr. 11).  As soon as the man entered the house, another gunshot rang out.  (Tr. 11-12).  Rogers estimated that the gunshot originated from the deck immediately outside his front door.  (Tr. 14-15).

Rogers secured a towel which his wife used to apply pressure to the victim's gunshot wound.  (Tr. 17-19).  Paramedics arrived at Rogers' residence "almost instantaneously" to treat the gunshot victim.  (Tr. 19-20).  Police officers arrived soon thereafter and during a search of the area traversed by the gunshot victim discovered a "plastic baggy" containing "some little sugary crystals."  (Tr. 24-25).  Rogers testified that the plastic baggy "absolutely" did not belong to him. (Tr. 28).  Rogers subsequently learned that the gunshot victim's name was Al Bailey.  (Tr. 23, 34-35).

6

**Officer David Orcharzak**

As of March 1, 1997, Officer Orcharzak was employed as a police officer for the City of Muskegon. (Trial Transcript, Oct. 29, 1997, 29-30). At approximately 11:20 p.m. that evening, while on patrol in the vicinity of Kenneth Street, Orcharzak heard a gunshot. (Tr. 30-31). Based on his experience training other police officers to properly fire various weapons, Officer Orcharzak determined that the shot he heard was fired from a "larger caliber weapon, possibly a rifle." (Tr. 31-32). Orcharzak continued driving for approximately one-half block before exiting his vehicle approximately 2-3 houses south of the intersection of Kenneth Street and Apple Avenue. (Tr. 32-34). Officer Orcharzak was then informed that "there was a shooting victim at 616 Apple." (Tr. 34).

Orcharzak walked to 616 Apple Avenue where he discovered Al Bailey being attended to by Harold Rogers' wife. (Tr. 34-35). After the paramedics arrived to treat Mr. Bailey, Orcharzak searched the Rogers' residence for evidence. (Tr. 35-36). During this search Orcharzak recovered a "sandwich baggy" which contained what appeared to be crack cocaine. (Tr. 36-37). While searching the area immediately outside the Rogers' front door, Officer Orcharzak recovered a spent rifle casing. (Tr. 38-39). Orcharzak believed the casing to have been fired by an SKS Chinese assault rifle. (Tr. 43).

**Candice Rogers**

Rogers testified that as of March 1, 1997, she resided at 616 Apple Avenue with her husband, Harold Rogers. (Trial Transcript, Oct. 29, 1997, 45-46). Rogers testified that on that evening she was at home with her husband watching television. (Tr. 45-46). While she was watching television, Rogers heard five gunshots. (Tr. 47). She indicated that she heard two

gunshots in quick succession followed by three gunshots in quick succession.  (Tr. 47).

Rogers identified Al Bailey as the wounded man who entered their house immediately following the gunshots.  (Trial Transcript, Oct. 29, 1997, 46-47).  While they were waiting for assistance to arrive, Bailey told Rogers that "they're after me, they're after me."  (Tr. 50).  Rogers asked him how many people were after him, to which Bailey indicated "three."  (Tr. 50).

**Shataun Smith**

Smith testified that prior to March 1, 1997, she often purchased crack cocaine at 1021 Kenneth Street.  (Trial Transcript, Oct. 29, 1997, 52-59).  Smith purchased cocaine at this location from Face and Shorty.  (Tr. 54-55).  Smith encountered Selma Davis inside the residence at 1021 Kenneth Street "two or three" times.  (Tr. 56-57).  Smith also observed Chandra Keenan at the residence "two or three" times.  (Tr. 57).

On the evening of March 1, 1997, Smith went to 1021 Kenneth Street to purchase cocaine.  (Tr. 58-59).  As she approached the house, she encountered Face, Selma Davis, Shorty, and Chandra Keenan.  (Tr. 59-60).  Smith approached Face and asked him if she could purchase cocaine. (Tr. 60-61).  Face agreed and the pair entered the house.  (Tr. 61).  The pair proceeded to the dining room table where the cocaine was located.  (Tr. 62).  However, before the transaction could be completed, Smith heard multiple gunshots "coming from outside" toward the front of the house.  (Tr. 62-63).  Smith testified that she heard more than five gunshots and that some of the gunshots were "louder" than others.  (Tr. 62-63).  Smith and Face immediately began to run toward the back door. (Tr. 63).  Before she could exit the house, however, Smith was shot several times and collapsed on

the kitchen floor. (Tr. 64, 75-76). She then "crawled behind the refrigerator" to protect herself. (Tr. 64). After crawling behind the refrigerator, Smith heard more gunshots. (Tr. 65).

When she thought that "it was all over," Smith "crawled back to the middle of the kitchen floor trying to get out of the door," when she observed "two guys" run past her. (Tr. 64-65). These individuals were wearing "dark" clothes and ski masks. (Tr. 65-66). Shortly thereafter, a third man ran past her carrying a handgun. (Tr. 66-67). Smith testified that Petitioner was the same height as the third man. (Tr. 68). Even though this third man was wearing a mask, Smith was able to see part of his face. (Tr. 67). Smith testified that the man's skin was much lighter than hers, so much so that she thought the man was "white." (Tr. 67-68, 78). Smith further testified that the shade of Petitioner's skin color matched that of the third man. (Tr. 67-68).


**Robert Miszewski**

On the night of March 1, 1997, Miszewski attended a party at 1033 Kenneth Street, which was located directly adjacent to 1021 Kenneth Street. (Trial Transcript, Oct. 29, 1997, 98-100). At approximately 10:45 p.m. he witnessed a man and a woman arguing in front of the residence at 1021 Kenneth Street. (Tr. 100-01). After a period of time, Miszewski heard approximately 15-16 gunshots. (Tr. 101-02). After the gunfire ceased, Miszewski walked next door where he discovered a woman with gunshot wounds to the leg. (Tr. 102-03). Miszewski then "ran out to the middle of Apple Avenue and flagged a cop down." (Tr. 103).


**Officer Robert DeYoung**

As of March 1, 1997, Officer DeYoung was employed as a police officer for the City

9

of Muskegon.  (Trial Transcript, Oct. 29, 1997, 107).  At approximately 11:20 p.m. that evening, Officer DeYoung was dispatched to 616 Apple Avenue.  (Tr. 108).  Upon his arrival, DeYoung observed Al Bailey who was being attended to by another officer.  (Tr. 108).  Approximately one minute later, DeYoung departed the residence after being informed that "somebody had seen the shooter."  (Tr. 108-09).

After leaving the residence, DeYoung was flagged down by Robert Miszewski who directed him to 1021 Kenneth Street.  (Tr. 109-10).  When he arrived at this location, Officer DeYoung discovered a woman near the back door who had been shot in the leg several times.  (Tr. 110-11).  DeYoung remained with this woman until paramedics arrived.  (Tr. 111).  When the paramedics cut away a portion of the victim's pants, a shell fragment dropped out of the cut away portion.  (Tr. 111-12).

Officer DeYoung then began to investigate the "front porch area" of the residence for evidence.  (Tr. 112).  As part of his investigation, DeYoung discovered seven "7.62-by-39" shells.  (Tr. 112).  DeYoung characterized these as "assault rifle shells."  (Tr. 112).  DeYoung also located two additional "7.62-by-39" shells "below the porch on the ground."  (Tr. 113-14).  Officer DeYoung secured this evidence until Detective Corrigan arrived at the crime scene.  (Tr. 113-14).

**Tony Northington**

On March 1, 1997, Northington drove Shataun Smith to 1021 Kenneth Street so that she could purchase cocaine.  (Trial Transcript, Oct. 29, 1997, 124-27).  When Northington arrived at that location, Smith exited the vehicle and Northington drove away.  (Tr. 127).  After driving "a block or two," Northington returned to 1021 Kenneth Street and parked his vehicle in the street to

wait for Smith. (Tr. 127-28). As he waited for Smith to return, Northington observed two men, both of whom were wearing dark clothing, "slumped over" near the side of the house. (Tr. 129-30). These two men then ran onto the front porch of the house and "started shooting the door." (Tr. 130). After firing 10-15 shots, these two men kicked in the front door and "just continued shooting." (Tr. 131). Northington then observed two men exit the rear of the house. (Tr. 132). The first man appeared to be running from the second man. (Tr. 132-34). Northington then witnessed the second man fire a "couple of shots." (Tr. 132-34).

**Paul Galdeen**

On the night of March 1, 1997, Galdeen attended a party at 1033 Kenneth Street. (Trial Transcript, Oct. 29, 1997, 144). Later that night, Galdeen was sitting in his vehicle preparing to depart the residence, when he heard gunfire. (Tr. 146-49). Galdeen immediately "looked over and saw somebody on the porch in the neighbor's house shooting into the front door and kicked it open." (Tr. 149). Galdeen then exited his vehicle and ran back into the house. (Tr. 150).

**Jeff DeLora**

On the night of March 1, 1997, DeLora attended a party at 1033 Kenneth Street. (Trial Transcript, Oct. 29, 1997, 165). At some point between 11:00 p.m. and 11:30 p.m., DeLora exited the residence and entered Paul Galdeen's vehicle. (Tr. 166-67). Before Galdeen was able to drive away, DeLora heard several gunshots. (Tr. 167-71). DeLora initially heard three gunshots. (Tr. 172). He then heard another volley of gunfire, consisting of 10-15 shots. (Tr. 172-73). DeLora testified that this second round of gunfire sounded different from the initial shots, as if the latter

11

shots were fired from an automatic weapon.  (Tr. 173).  DeLora then exited the vehicle and ran back inside the house.  (Tr. 171-74).

**Lisa Miszewski**

As of March 1, 1997, she resided at 1033 Kenneth Street.  (Trial Transcript, Oct. 29, 1997, 185).  On that evening, Miszewski hosted a party at her house.  (Tr. 185).  At approximately 11:30 p.m. that evening, Miszewski witnessed three black women and one black man standing in her driveway arguing.  (Tr. 187-90).  After telling these individuals to "get out" of her yard, Miszewski walked over to the vehicle in which Paul Galdeen and Jeff DeLora were sitting.  (Tr. 187-90).

Miszewski then heard gunfire and "hit the ground."  (Tr. 190).  She initially heard "around 10" shots.  (Tr. 190).  After waiting "a few moments," Miszewski looked up and saw "someone in black clothing, black long leather jacket, black pants running towards the front of the 1021 Kenneth Street address."  (Tr. 191).  Miszewski observed this man firing his weapon towards the house at 1021 Kenneth Street.  (Tr. 191).  Miszewski testified that the two volleys of gunfire appeared to have been fired from "different types of guns."  (Tr. 191).

**Selma Mardella Davis**

Davis testified that she had been charged with first degree murder and conspiracy to commit robbery.  (Trial Transcript, Oct. 29, 1997, 200).  Davis indicated that she was testifying pursuant to a plea agreement.  (Tr. 200-01).  Pursuant to this plea agreement, Davis agreed to "cooperate fully and testify truthfully concerning any and all persons involved in the robbery and

12

murder" on March 1, 1997. (Tr. 201). Davis also agreed to plead guilty to second degree murder. (Tr. 201). In return, the charges of first degree murder and conspiracy to commit robbery would be dismissed. (Tr. 201-02). The plea agreement did not include an agreement as to the sentence Davis would receive. (Tr. 202). Davis acknowledged that she is known as "Little Selma" and that her mother is known as "Big Selma." (Trial Transcript, Oct. 30, 1997, 80).

Davis testified that as of March 1, 1997, she had known Petitioner for "a year or two." (Trial Transcript, Oct. 29, 1997, 205). Davis indicated that prior to March 1, 1997, she would visit Petitioner "like every day." (Tr. 205-06). Davis also testified that she visited with Chandra Keenan and Whonita McGruther "every day." (Tr. 206). Davis reported that she knew Tyrone Williams (a.k.a. Man-Man), Damien Taylor, and Clyde Wilson. (Tr. 206-07). Davis testified that Williams and Taylor were both "real dark skinned." (Tr. 207). She also testified that Wilson had "dark brown" skin. (Tr. 208).

Davis and Whonita McGruther met Shorty and Face "a couple weeks" before the shooting. (Tr. 208-09). A "couple days" after meeting Shorty and Face, Davis and McGruther began visiting the residence at 1021 Kenneth Street. (Tr. 209). While at this residence, Davis observed Shorty and Face selling rock cocaine. (Tr. 209-10). Davis was certain that Shorty and Face were "making money" selling drugs. (Tr. 210). Davis also observed that Shorty and Face carried weapons. (Tr. 212-13).

Davis subsequently talked with Petitioner and Chandra Keenan about robbing Shorty and Face. (Tr. 213-14). In response, Petitioner stated that "if I hit them up, I'm going to need somebody with some heat." (Tr. 213). Davis testified that "heat" referred to "guns." (Tr. 213-14). A "couple days" after this conversation occurred, Davis was riding around with Petitioner when they

13

spotted Man-Man. (Tr. 216). Davis approached Man-Man and asked him if he wanted to help Petitioner "rob some dudes." (Tr. 217). Man-Man asked to talk with Petitioner. (Tr. 217-18). Petitioner and Man-Man had a very brief conversation (which Davis could not hear), after which Man-Man told Davis to page him when "we was ready." (Tr. 218-19). Shorty and Face were out of town when this conversation between Davis, Petitioner, and Man-Man occurred. (Tr. 219).

       At approximately 5:00 p.m. on March 1, 1997, Davis received a telephone call from Shorty and Face, informing her that they were at the Kenneth Street residence. (Tr. 220-21). Shorty and Face wanted Davis and McGruther to stop over and visit them. (Tr. 221-22). Davis agreed to this request because "we were fittin' to rob them." (Tr. 222-23). As soon as Davis hung up the telephone, Petitioner "walked in the door" of Davis' residence. (Tr. 223). Davis informed Petitioner that Shorty and Face were back in town, to which Petitioner simply nodded his head. (Tr. 223-24). Davis then paged Man-Man, who arrived shortly thereafter. (Tr. 223-24). After arriving at Davis' residence, Man-Man placed a telephone call. (Tr. 224). After Man-Man finished speaking on the telephone, Petitioner asked him "did he have his heat," to which Man-Man replied, "yeah." (Tr. 224-25).

       Man-Man then told Petitioner that he first had to drop some people off, but that he would return. (Tr. 225). After Man-Man departed, Davis, Keenan, and Petitioner began "getting dressed" to commit the robbery. (Tr. 225). Before Man-Man returned, Shorty telephoned Davis and again asked her to come over to the Kenneth Street residence. (Tr. 226). When Davis suggested that she did not have a way to get to their house, Shorty told her to take a cab and Face told her that he would pay the cab fare. (Tr. 226). Davis, Keenan, and McGruther then took a cab to 1021 Kenneth Street. (Tr. 226-28).

A short while later, Davis received a page directing her to telephone home. (Tr. 228-31). When Davis phoned home, Man-Man answered the call. (Tr. 230-31). Man-Man asked Davis "how many was over there, and was there a back door, and how was the furniture, and stuff like that." (Tr. 231). After being informed of such things, Man-Man told Davis, "give me 10, 15 minutes and we'll be over there." (Tr. 231). Davis believed that Petitioner, along with others, would accompany Man-Man. (Tr. 231).

Davis, Keenan, and McGruther then exited the residence and walked to the driveway of the 1033 Kenneth Street address where they stood speaking with Shorty. (Tr. 231-36). While standing in the driveway, Davis observed several individuals exit the 1033 Kenneth Street residence and enter a car to leave. (Tr. 236). Davis then observed Shataun Smith enter the 1021 Kenneth Street residence with Face. (Tr. 237). Davis then observed "four dudes in some masks" approach the house at 1021 Kenneth Street. (Tr. 237-38).

Despite the fact that these men were wearing masks, Davis was able to see a portion of one of the men's head. (Tr. 242). One of the assailants was wearing a mask that did not cover his head, but rather covered only his face. (Tr. 242-43). Davis testified that she had recently purchased for Petitioner (at his request) this very type of mask. (Tr. 242-43). Davis observed that this man's hair had "puff balls," which she described as "little square boxes of hair in [a] rubber band." (Tr. 242). Davis testified that she had styled Petitioner's hair into "puff balls." (Tr. 242). Davis also identified one of the other assailants as Man-Man. (Tr. 241-47). Davis testified that she was able to identify him based on her knowledge of his gait and build. (Tr. 241-47).

Man-Man and one of the other assailants "walked over with an assault rifle and pointed it at Shorty," at which point Davis, Keenan, and McGruther "took off running." (Tr. 241-

15

44).  As Davis ran away she heard "a lot" of gunfire.  (Tr. 244-45).  After running approximately

two blocks, Davis observed Man-Man's car moving in reverse down the roadway.  (Tr. 245-46).

Davis observed Petitioner, who was no longer wearing his mask, jump into the vehicle's back seat.

(Tr. 246).  Davis testified that Petitioner still had the puff-balls in his hair.  (Tr. 246).  The vehicle

then stopped so that Petitioner could drive, at which point Davis, Keenan, and McGruther jumped

in the vehicle.  (Tr. 247-49).

Petitioner drove away and soon thereafter saw Man-Man standing on a street corner.

(Tr. 249-51).  Petitioner slowed down, but Man-Man just tossed his coat in the back seat and

instructed Petitioner to keep driving.  (Tr. 251).  Petitioner then proceeded to Davis' residence,

where Davis, Keenan, McGruther, and Damien (another of the assailants) exited the vehicle.  (Tr.

251-52).  Petitioner drove away, but returned "a few minutes later" with Man-Man.  (Tr. 252-54).

Man-Man hid his assault rifle in Davis' bedroom.  (Tr. 255).  Petitioner gave Davis two handguns,

one of which was a "baby 22," and told her to put them in her dresser.  (Tr. 255-57).

At some point following the March 1, 1997 shooting, Davis went to stay with

Madaline Spinks in Benton Harbor.  (Trial Transcript, Oct. 30, 1997, 67-69).  Davis testified that

she traveled to Benton Harbor because "the detectives was looking for me."  (Tr. 73).  Davis stayed

with Spinks for approximately two weeks before being arrested.  (Tr. 71-73).


**Dr. Jeffrey Recknagel**

Dr. Recknagel treated Shataun Smith and Al Bailey following the March 1, 1997

shootings at 1021 Kenneth Street and 616 Apple Avenue.  (Trial Transcript, Oct. 30, 1997, 9-15,

25).  The doctor testified that Smith suffered injuries caused by both high velocity and low velocity

16

projectiles.  (Tr. 22-23).  Bailey suffered injuries that could have been caused by a high velocity projectile, a low velocity projectile, or both.  (Tr. 25-29).  According to Dr. Recknagel, a high velocity projectile is fired from a rifle or other gun capable of firing a projectile at "higher speeds," whereas a low velocity projectile is "typically" fired from a handgun.  (Tr. 12, 32).

**Lavese Potts**

On the night of March 1, 1997, Potts and Christie Hall were riding in Hall's vehicle. (Trial Transcript, Oct. 30, 1997, 104-06).  When the vehicle reached the intersection of Getty and Apple, Potts heard several gunshots.  (Tr. 106-07).  Hall immediately turned onto Apple Avenue. (Tr. 107-08).  As they headed down Apple Avenue, Potts observed three men, all of whom were wearing masks and dark clothing, run toward the house at 616 Apple Avenue.  (Tr. 108-12, 126-27). The first man approached the door of this residence and then "he opened the door and shot in."  (Tr. 111).  This man then turned around and began to run back across the street.  (Tr. 112).  As he did so, the man passed "literally immediately next to" Hall's vehicle.  (Tr. 112-13).  Despite the fact that the man was wearing a mask, Potts was able to see portions of his facial skin.  (Tr. 113, 122).  Potts described the man's skin color as "light brown or maybe even white."  (Tr. 113).

**Dr. Richard Peters**

Dr. Peters performed an autopsy on Timothy Horton, concluding that he died as a result of injuries caused by a high velocity projectile.  (Trial Transcript, Oct. 30, 1997, 178-92).

**Detective John Corrigan**

17

As of March 1, 1997, Corrigan was employed as a detective with the Muskegon Police Department.  (Trial Transcript, Oct. 30, 1997, 194-95).  At approximately 11:30 p.m. that night he was directed to investigate the shootings at 1021 Kenneth Street.  (Tr. 195).  On the porch of the residence, Corrigan discovered seven "7.62 by 39" cartridges.  (Tr. 199-200).  Two additional shell casings were discovered in the vicinity of the porch.  (Tr. 214).  Detective Corrigan discovered eight bullet holes in the front door with another bullet hole in the door frame.  (Tr. 215).  Several more bullet holes were discovered throughout the living room, kitchen, and back porch of the residence.  (Tr. 215-34).  Ballistics testing of a bullet recovered from the residence revealed it to be a .22 caliber projectile.  (Tr. 243-47).  An investigation of the residence failed to uncover any identifiable fingerprints.  (Tr. 238-42).


**Chandra Keenan**

Keenan testified pursuant to a plea agreement.  (Trial Transcript, Oct. 31, 1997, 31-32-33).  She was originally charged - as a juvenile - with first degree murder.  (Tr. 32).  Pursuant to the plea agreement, Keenan pleaded guilty to second degree murder and agreed to "testify truthfully in any and all proceedings" regarding the events of March 1, 1997.  (Tr. 32, 37).  In return, the State agreed to not charge her as an adult.  (Tr. 32).

Keenan testified that she had known Petitioner and Little Selma for several years.  (Tr. 35-36).  Keenan indicated that she thought that Petitioner and Little Selma were "boyfriend and girlfriend" because of the amount of time the two spent together.  (Tr. 36).

The day prior to the March 1, 1997 robbery, Little Selma told Keenan that "Dontay and Man-Man was planning on robbing these Detroit boys that she knew."  (Tr. 37-40).  The plan

18

was to "take their money and their drugs." (Tr. 41). The following day, Little Selma told Keenan that Petitioner "had talked to Man-Man and that it was gonna go down that night for sure." (Tr. 46). Little Selma told Petitioner to be careful because "they had guns." (Tr. 45). Petitioner responded that "if they tried to fight back or anything, he would shoot them in the legs, not to try to hurt them or where they could die or nothing, just so they couldn't fight back." (Tr. 101). According to Keenan, Petitioner then stated that "if they got the money that he'd - - he'd hook us up," which Keenan interpreted as meaning that Petitioner would "give us some money." (Tr;. 101-02).

At approximately 9:00 p.m. on March 1, 1997, Keenan, Little Selma, and Whonita McGruther departed Little Selma's residence and proceeded to 1021 Kenneth Street. (Tr. 48-49). When they arrived at the 1021 Kenneth Street residence they were greeted by Shorty and Face. (Tr. 49, 51). Later in the evening, Little Selma received a message on her pager. (Tr. 54). Little Selma then made a telephone call, immediately after which she told Keenan and McGruther that the robbery "was fittin' to happen." (Tr. 54-55). Keenan, Little Selma, and McGruther then exited the house because they did not want to be inside when the robbery occurred. (Tr. 55-58).

The trio was standing outside talking with Shorty when the robbery began. (Tr. 60). One of the robbers approached Shorty carrying "a long, black gun with a banana clip," at which point Keenan, Little Selma, and McGruther ran away. (Tr. 60-63). As the trio was running away, Keenan heard gunfire from multiple weapons. (Tr. 63). After running an unknown distance, Keenan saw Man-Man's car proceeding in reverse down the street. (Tr. 64-65). Keenan then observed Petitioner running towards the car. (Tr. 67). When Keenan, Little Selma, and McGruther reached the vehicle, Clyde Wilson exited the vehicle and said that "he was gonna walk." (Tr. 62, 67). Petitioner then stated "that he'll drive." (Tr. 68-69). Keenan, Little Selma, and McGruther

19

entered the vehicle.  (Tr. 69).  Petitioner then drove "around the block" during which time they

encountered Damien and Man-Man.  (Tr. 70-73).  Damien jumped in the vehicle, but Man-Man told

Petitioner "to keep going."  (Tr. 72-73).

Petitioner drove to Little Selma's residence, where Damien, Keenan, Little Selma,

and McGruther exited the vehicle.  (Tr. 73).  Petitioner stated that he was going to go pick up Man-

Man, at which point he drove away.  (Tr. 73).  Petitioner and Man-Man returned to Little Selma's

residence a few minutes later.  (Tr. 74-75).  Keenan observed that Man-Man was carrying "the same

gun I seen from in the street, the long black gun with the banana clip."  (Tr. 75).  Man-Man carried

his weapon to Little Selma's bedroom.  (Tr. 76).  Keenan entered Little Selma's bedroom where she

observed Petitioner reloading "a 22 revolver."  (Tr. 76-77).

Petitioner later asked Keenan if she was "scared," to which Keenan stated, "yeah."

(Tr. 82).  Petitioner instructed Keenan "don't worry about it and don't say nothing to nobody."  (Tr.

82).  Man-Man later instructed Keenan "not to say nothing to the police or my mama or nothing

about what had just happened."  (Tr. 83-84).  Man-Man then told Keenan that he would kill her if

she spoke to anybody about the robbery.  (Tr. 84).


**Detective Lieutenant James Bullock**

Bullock, a laboratory specialist with the Michigan State Police, testified as a firearms

identification expert.  (Trial Transcript, Oct. 31, 1997, 158-61).

Bullock testified that the 7.62 by 39 cartridges that were recovered from the crime

scene "were all fired from the same firearm," a Russian or Chinese manufactured assault rifle.  (Tr.

161-65).  Bullock indicated that a banana clip can be attached to such a firearm.  (Tr. 167).  Bullock

testified that such an assault rifle fires high velocity projectiles.  (Tr. 170-71).  Bullock testified that

one of the bullets recovered from the crime scene was fired from a .22 caliber weapon, which fires

projectiles with much less velocity than an assault rifle.  (Tr. 175-76).

**Selma Joy Davis**

Davis (a.k.a. Big Selma) is Little Selma's mother.  (Trial Transcript, Oct. 31, 1997,

204).  Big Selma testified that prior to March 31, 1997, Petitioner visited her house "pretty much

every day" to visit Little Selma.  (Tr. 205).  At some point prior to March 1, 1997, Little Selma told

her mother that "Dontay and me - and them and some boys were gonna rob the - some D boys."  (Tr.

207-08).  Big Selma told her daughter "not to get involved in no mess like that."  (Tr. 208).

On March 2, 1997, Big Selma told Petitioner that, because of the events of the

previous night, she did not want him to have any further contact with her daughter.  (Tr. 212-13).

Petitioner told Big Selma that "things had gotten out of hand at the robbery."  (Tr. 213).  Petitioner

told Big Selma that "they was not supposed to shoot no where but below the knees," but that

"Tyrone Williams got out of hand."  (Tr. 214).  Petitioner also told Big Selma that his mother had

disposed of the guns by throwing them "in a dumpster somewhere."  (Tr. 214).

**Al Bailey**

Bailey testified that as a result of the events of March 1, 1997, he had already been

convicted and sentenced for possession with the intent to deliver cocaine.  (Trial Transcript, Oct.

31, 1997, 237).  Bailey reported that he was not testifying pursuant to any agreement or deal.  (Tr.

238).

Bailey testified that his nickname was Face.  (Tr. 238).  He indicated that Tim Horton used to be known as Shorty.  (Tr. 238-39).  Bailey testified that on the evening of March 1, 1997, Little Selma and Whonita McGruther visited the residence at 1021 Kenneth Street where he and Shorty were selling drugs.  (Tr. 239-41).  Later that evening Shataun Smith arrived at the residence to purchase drugs.  (Tr. 242-43).  While he was transacting business with Smith, Bailey heard gunshots outside.  (Tr. 243).

Bailey ran out the rear door of the house as he was being chased by somebody with a gun.  (Tr. 243-45).  The man that was chasing Bailey kept saying "give me the money."  (Tr. 245-46).  Bailey ran to a nearby house and knocked on the door.  (Tr. 245).  As Bailey was entering this house, he was shot in the arm, stomach, and hand.  (Tr. 246-47).  Bailey testified that he was unable to remember anything else that occurred that evening.  (Tr. 246).

**Clyde Wilson**

Wilson testified pursuant to a plea agreement.  (Trial Transcript, Nov. 4, 1997, 13-14).  Wilson had been charged with first degree murder and conspiracy to commit robbery.  (Tr. 13).  In return for his agreement to "cooperate fully and testify truthfully" in any and all criminal proceedings regarding the March 1, 1997 shooting, Wilson was allowed to plead guilty to second degree murder.  (Tr. 13).

Wilson testified that he had known Damien Taylor for "almost five years."  (Tr. 15).  Wilson indicated that he had known Man-Man for 3-4 years.  (Tr. 15-16).  On March 1, 1997, Wilson visited Damien Taylor at his residence.  (Tr. 18).  Man-Man was also present at the house.  (Tr. 20-21).  Man-Man informed Wilson that he was planning to commit a robbery "on Kenneth

Street." (Tr. 21-22). Man-Man asked Wilson if he would act as driver for the robbery and Wilson agreed. (Tr. 22-23). Wilson thought that he would "probably get some money out of the deal." (Tr. 24).

Man-Man and Taylor then departed in Man-Man's vehicle. (Tr. 24). Wilson followed the pair in his vehicle. (Tr. 24). Wilson followed Man-Man to a residence on Pine Street. (Tr. 25). When they arrived at this residence, Wilson parked his vehicle and entered the driver's side of Man-Man's car. (Tr. 25-26). Petitioner then exited the residence and got into Man-Man's car. (Tr. 26-27). Wilson then proceeded to the Kenneth Street location. (Tr. 27-29).

After driving past the robbery location several times, Wilson parked the vehicle nearby. (Tr. 28-33). Man-Man then exited the vehicle and retrieved a "big. . .automatic-type" weapon from the trunk. (Tr. 33-35). Petitioner and Taylor then exited the vehicle and began "pulling they pants up and stuff" in a way that made Wilson believe that they were carrying weapons. (Tr. 36-39). Man-Man, Petitioner, and Taylor, all of whom were wearing masks, then departed towards Kenneth Street. (Tr. 39-40, 42-43).

Wilson heard gunshots a short while later. (Tr. 44-45). After the gunfire ended, Wilson saw Petitioner running toward the vehicle. (Tr. 45). Petitioner got into the car and told Wilson to "drive away." (Tr. 46). Wilson testified that he instead exited the car "because I didn't want no part of that after I heard the gunshots." (Tr. 46). Petitioner then got into the driver's seat. (Tr. 46). Several girls also entered the car and Petitioner drove away. (Tr. 46-47).

**Officer Michael Ferrier**

As of March 1, 1997, Ferrier was employed as a police officer for the City of

Muskegon.  (Trial Transcript, Nov. 4, 1997, 75).  On March 2, 1997, Officer Ferrier interviewed Petitioner.[2]  (Tr. 91).  During this interview, Petitioner denied that he was at 1021 Kenneth Street on March 1, 1997.  (Tr. 91-94).

Petitioner was again interviewed on March 4, 1997.[3]  (Tr. 95-96).  During this interview, Petitioner changed his story and stated that he was, in fact, at 1021 Kenneth Street when the robbers arrived.  (Tr. 99-100).  Petitioner told Officer Ferrier that he was able to identify Carl Johnson as one of the shooters.  (Tr. 99-100).  Officer Ferrier testified that Carl Johnson is a "little darker" than Petitioner, but is nonetheless "light" skinned.  (Tr. 100).  During this interview, Petitioner was "trembling," "physically shaking" and "perspiring profusely."  (Tr. 100).

**Laurie Potter**

Potter testified on Petitioner's behalf.  Potter testified that Petitioner worked for Hot and Now from January 17, 1997, through March 26, 1997, during which time she served as his supervisor.  (Trial Transcript, Nov. 5, 1997, 109-11).  Potter testified that Petitioner "was a very good worker" who exhibited a "very good" attitude.  (Tr. 111-12).  Potter also described Petitioner as polite and respectful.  (Tr. 112).  Potter testified that Petitioner was never late for work and always "did all work and chores assigned to him during his shifts."  (Tr. 113-14).

Following a jury trial, Petitioner was convicted of (1) second degree murder; (2) conspiracy to commit armed robbery; (3) two counts of assault with the intent to do great bodily

---

[2]  The tape recording of this interview was played for the jury, but a transcription of such does not appear in the record.

[3]  The tape recording of this interview was played for the jury, but a transcription of such does not appear in the record.

harm less than murder; and (4) three counts of possessing a firearm during the commission of a felony. (Trial Transcript, Nov. 6, 1997, 114-16). In light of his extensive criminal history, Petitioner received the following prison sentences: (a) 40-75 years for second degree murder; (b) 25-75 years for conspiracy to commit armed robbery; (c) 6-10 years for each conviction for assault with the intent to do great bodily harm less than murder; and (d) two years for each of the convictions for possessing a firearm during the commission of a felony. (Sentencing Transcript, Nov. 26, 1997, 19-29). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.      The prosecution failed to produce sufficient evidence at trial to sustain a jury verdict of guilt beyond a reasonable doubt to the offenses of conspiracy to commit armed robbery and second degree murder.

II.     The jury verdict finding defendant guilty of second degree murder was inconsistent with the evidence, the product of a misunderstanding of the jury instructions and/or constituted an impermissible compromise verdict.

III.    The prosecutor elicited from his witnesses and argued to the jury that the plea bargains extended to accomplice witnesses Selma Davis, Clyde Wilson and Chandra Keenan included that they testify truthfully, placing the prestige of the prosecutor's office behind them, vouched for the truthfulness of his testimony, while minimizing the full value of their plea bargains.

IV.    The defendant was denied his right to a fair trial under the Michigan and federal constitutions by the intentional prosecutorial misconduct in his improper and highly prejudicial argument to the jury where he: vouched for the truthfulness of his witnesses; denigrated the defendant, his defense, and defense counsel; mischaracterized the evidence; misstated the law; expressed his personal belief in defendant's guilt; and appealed to the sympathy of the jurors for

the victims as a basis to convict.

V.    Defendant's sentencing proceeding was tainted by reversible error where:

    A.    the trial court failed to properly consider the established sentencing factors and standards and failed to articulate valid reasons for imposing a 40-75, 25-75, and 6-10 year sentences upon defendant.

    B.    the trial court violated the concept of proportionality in imposing the 40-75, 25-75, and 6-10 year sentences.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. McMann*, No. 208949, Opinion (Mich. Ct. App., June 9, 2000). Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. McMann*, No. 117300, Order (Mich., Feb. 26, 2001).

On June 4, 2002, Petitioner filed in this Court a petition for writ of habeas corpus in which he asserted the following claims:

    I.    The State of Michigan failed to produce sufficient evidence at trial to sustain a jury verdict of guilt beyond a reasonable doubt of conspiracy to commit armed robbery and second degree murder denying Petitioner due process.

    II.    The jury verdict of guilty of second degree murder was inconsistent with the evidence, was the product of a misunderstanding of the jury instructions and thus constituted an impermissible compromise verdict violating Petitioner's right to due porcess.

    III.    Petitioner was denied his right to due process and a

fundamentally fair trial when the prosecutor suggested to the jury that plea bargains made with accomplice witnesses Selma Davis, Clyde Wilson and Chandra Keenan included the requirement that their testimony be truthful thus placing the prestige of the prosecutor's office behind the witnesses and vouching for the truthfulness of their testimony while minimizing the full value of their plea bargains.

IV.   Petitioner was denied his right to due process and a fundamentally fair trial when the prosecutor intentionally engaged in misconduct by improperly vouching for the truthfulness of testimony given by prosecution witnesses, by denigrating the character of Petitioner, his defense strategy and defense counsel, by mischaracterizing the evidence, by misstating the law, by expressing to the jury his personal belief in defendant's guilt, and appealing to the sympathy of the jury as a basis for conviction.

V.   Petitioner was denied his right to due process when the state court failed to sufficiently articulate its rationale for any of the sentences imposed.

VI.   Petitioner was denied his right to be free from cruel and unusual punishment when the state court imposed a 40-75 year sentence for second degree murder because Petitioner has no reasonable expectation of being able to complete the sentence within his lifetime.

VII.   Petitioner was denied his right to counsel of choice when the trial court denied his motion for substitution of counsel.

VIII.   Petitioner was denied his right to the effective assistance of counsel at trial when:

A.   Trial counsel refused to demand or otherwise seek discovery and thus failed to avail Petitioner of potentially exculpatory evidence.

B.   Trial counsel refused to confront

27

testifying codefendants regarding a
conspiracy to lie and place blame on
Petitioner despite having written
correspondence establishing the
existence of such a conspiracy.

C.    Trial counsel failed to call witness
Mary Lou Ridley despite having
information that she would testify to
having knowledge that someone other
than Petitioner committed the acts
Petitioner was convicted and
sentenced for.

(Dkt. #1).

On July 9, 2003, the Court administratively closed this matter so that Petitioner could

return to state court to exhaust those claims asserted in his petition for habeas relief which were not

yet properly exhausted. (Dkt. #14). Petitioner subsequently filed in the trial court a motion for relief

from judgment in which he asserted the following claims:

I.    Defendant was denied the effective assistance of
counsel at trial.

II.    Defendant was denied a fundamentally fair trial when
the prosecutor repeatedly engaged in intentional and
prejudicial conduct.

III.    Defendant was denied his right to due process when
statements made by defendant were admitted as
evidence at trial and those statements were coerced
and taken in violation of defendant's right to remain
silent.

IV.    Defendant was denied his right to the effective
assistance of counsel on appeal when counsel failed
to raise meritorious issues on direct and appeal and
incompetently raised and argued issues that were
presented.

V.    Any procedural default relating to the issues raised in

28

> this motion, in addition to being excused by the
> incompetent performance of appellate counsel, is also
> excused by the fact of defendant's actual innocence
> and to allow defendant's conviction to stand would be
> a miscarriage of justice.

Concluding that Petitioner was not entitled to relief pursuant to MCR 6.508(D), the trial court denied Petitioner's request for relief. *People v. McMann*, No. 97-140487-FC, Opinion and Order (Muskegon Cnty. Cir. Ct., Oct. 16, 2003). Raising the same issues, Petitioner moved in the Michigan Court of Appeals for leave to appeal. Petitioner's request was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. McMann*, No. 258443, Order (Mich. Ct. App., Apr. 7, 2005). Raising the same issues, Petitioner moved in the Michigan Supreme Court for leave to appeal. Petitioner's request was denied because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. McMann*, No. 128798, Order (Mich., Nov. 29, 2005).

After pursuing relief in the state courts, Petitioner returned to this Court by submitting an amended petition for writ of habeas corpus in which he asserts the following claims:

I.   Any alleged or actual procedural default is excused by the ineffective assistance of trial and appellate counsel and by the fact of Petitioner's actual innocence of the crimes charged.

II.  Petitioner was denied his Sixth Amendment right to the effective assistance of counsel at trial which resulted in the conviction and incarceration of an innocent man.

III. Petitioner was denied his Fifth and Fourteenth Amendment rights to due process by the repeated and intentional misconduct of the prosecution.

IV.  Petitioner was denied his Fifth and Fourteenth Amendment rights to due process and Fifth

Amendment right to remain silent because statements extracted by police with coercion were admitted at trial as evidence against him.

V.   Petitioner was denied his Fifth and Fourteenth Amendment rights to due process because his convictions for second-degree murder and for conspiracy to commit armed robbery are not supported by sufficient evidence.

## STANDARD OF REVIEW

McMann's petition, filed June 4, 2002, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

30

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle

to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## **ANALYSIS**

### I.        **Sufficiency of the Evidence Claim**

Petitioner asserts that he is entitled to habeas relief because his convictions for second degree murder and conspiracy to commit armed robbery "are not supported by sufficient evidence." Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When assessing whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006).  Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

A.      Conspiracy to Commit Armed Robbery

Under Michigan law then in effect, a conspiracy was defined as a "mutual agreement or understanding, express or implied, between two or more persons to commit a criminal act or to accomplish a legal act by unlawful means."  *People v. Cotton*, 478 N.W.2d 681, 688 (Mich. Ct. App. 1991).  Conspiracy is a specific-intent crime and requires "both the intent to combine with others and the intent to accomplish the illegal objective."  Direct proof of the agreement is not required, nor is it necessary to present proof of the existence of a formal agreement.  It is sufficient that "the circumstances, acts, and conduct of the parties establish an agreement."  The conspiracy "may be proven by circumstantial evidence or may be based on inference" and "no overt act in furtherance of the conspiracy is necessary."  *Id.*  The elements of armed robbery were: (1) an assault; (2) a felonious taking of property from the victim's presence or person; and (3) while the defendant is armed with a weapon identified in the relevant statute.  *See People v. Turner*, 540 N.W.2d 728, 734 (Mich. Ct. App. 1995).

As detailed above, the testimony of Little Selma, Chandra Keenan, and Clyde Wilson

establish that Petitioner participated in a conspiracy to assault and feloniously take property from Face and Shorty while armed with firearms.  Petitioner nonetheless asserts that his conviction on this charge must be overturned because the witnesses who provided the evidence in support thereof testified pursuant to plea agreements.  This fact, while relevant, is but one factor which jurors may consider when assessing the credibility of a witness.  As noted above, credibility determinations are resolved by the trier of fact and the Court may not substitute its judgment for that of the jury.

### B.      Second Degree Murder

Petitioner was convicted of second degree murder as an aider and abetter.  Under Michigan law then in effect, the elements of second degree murder were: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse.  *See People v. Bailey*, 549 N.W.2d 325, 331 (Mich. 1996).  Malice is defined as "the intent to kill, an intent to inflict great bodily harm, or the wanton and wilful disregard of the likelihood that the natural tendency of the defendant's behavior is to cause death or great bodily harm."  *People v. Hopson*, 444 N.W.2d 167, 169 (Mich. Ct. App. 1989).  Malice may be inferred "from the facts and circumstances of the killing," *People v. Kemp*, 508 N.W.2d 184, 187 (Mich. Ct. App. 1993), including "evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980).

To convict an individual as an aider and abetter the following elements must be established: (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or gave encouragement which aided and assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the

principal intended its commission at the time he gave aid or encouragement.  *See People v. Bates*, 2000 WL 33421465 at *1 (Mich. Ct. App., April 28, 2000) (citing *People v. Turner*, 540 N.W.2d 728 (Mich. Ct. App. 1995)).

As detailed above, Shorty was murdered during the robbery in which Petitioner participated.  Thus, there is no question that a murder occurred, rather the issue is whether Petitioner can properly be punished for such as an aider and abettor.  In this respect, Petitioner asserts that the evidence in this matter "established only that Petitioner was present during various conversations and in the car after the incident."  While the evidence certainly established these things, it also established much more.  As the Michigan Court of Appeals correctly concluded:

> Circumstantial evidence established that [Tyrone] Williams committed the fatal shooting of Timothy Horton, but defendant was aware that Williams was armed during the commission of the offense.  The evidence further showed that defendant and the others planned to steal drugs, money, and weapons from the victims and were prepared to shoot the victims 'below the knees' if they encountered any resistance.  That defendant only intended to shoot the victims below the knees (a presumably non-fatal area) does not eliminate a conviction for second degree murder because firing a weapon directly at another human demonstrates the willful disregard for the likelihood that such action will cause great bodily harm or death sufficient to establish second-degree murder.
>
> Moreover, the record established that there were several different bullets discovered at the crime scene, and that more than one type of gun was fired.  Thus, although the jury could have reasonably inferred from this evidence that defendant and/or the other accomplices also fired gunshots at the victims, even if defendant did not directly fire the weapon that inflicted the fatal shot to Horton, the evidence shows that his words and actions incited and encouraged Williams to commit the offense.  In sum, defendant's conversation with Little Selma regarding the planning of the offense, his insistence that they obtain weapons to effectuate the offense, his comment that, if necessary, they were prepared to shoot below the knees, and his participation, whether directly or indirectly, in the commission of the offense, all establish that he had the requisite intent.  Thus, viewing

35

> the evidence in the light most favorable to the prosecution, the prosecution presented sufficient evidence to establish that defendant committed second degree murder, either as a principal or as an aider and abettor.

*People v. McMann*, No. 208949, Opinion at 3 (Mich. Ct. App., June 9, 2000).

The Michigan Court of Appeals concluded that viewing the evidence in this matter in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of conspiracy to commit armed robbery and second degree murder. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Petitioner's Remaining Claims have been Procedurally Defaulted

In his petition for writ of habeas corpus, McMann also asserts the following claims: (1) he was denied the right to the effective assistance of trial counsel; (2) the prosecuting attorney engaged in misconduct; and (3) statements he made to the police were improperly admitted against him at trial. As discussed below, however, Petitioner has procedurally defaulted these claims, precluding their consideration by this Court.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate

state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim.  *See Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  To find that a petitioner has procedurally defaulted a particular claim, "the last state court rendering a judgment in the case must have based its judgment on the procedural default."  *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish the existence of cause and prejudice for his procedural default, or if a fundamental miscarriage of justice would result from the failure to grant the relief he seeks.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991); *Coleman*, 501 U.S. at 750-51; *Silverberg v. Evitts*, 993 F.2d 124, 127 (6th Cir. 1993); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To establish that a miscarriage of justice would result from the Court's failure to review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence."  *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).  The burden to make this showing rests with Petitioner, *see Floyd v. Alexander*, 148 F.3d 615, 618

(6th Cir. 1998); *Mitchell v. Rees*, 114 F.3d 571, 577 (6th Cir. 1997), who must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error probably resulted in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326. This requires Petitioner to overcome a hurdle higher than that to establish prejudice. *Id.*

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R. 6.508(D)(3). In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default. *See Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2002); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied. *Simpson*, 238 F.3d at 407 (6th Cir. 2000).

With respect to his claims that he was denied the right to the effective assistance of

trial counsel and that statements he made to the police were improperly admitted against him at trial, Petitioner failed to assert such in his direct appeal as of right. Instead, Petitioner presented these claims in his post-conviction motion for relief. As previously noted, however, the state courts all declined to review the merits of these claims on the ground that Petitioner failed to comply with Michigan Court Rule 6.508(D).

While Petitioner presented his claims of prosecutorial misconduct in his direct appeal as of right, the Michigan Court of Appeals declined to address the merits of such "because [Petitioner] did not object to any of the instances of alleged prosecutorial misconduct at trial." *People v. McMann*, No. 208949, Opinion at 5 (Mich. Ct. App., June 9, 2000). As is well recognized, the "failure to object contemporaneously is a generally recognized, firmly established independent and adequate state law ground for refusing to review trial errors." *Burton v. Bock*, 187 Fed. Appx. 465, 470 (6th Cir., June 27, 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 747 (1991)). Furthermore, the fact that the Michigan Court of Appeals nonetheless reviewed Petitioner's claims of prosecutorial misconduct to prevent a miscarriage of justice does not constitute a review on the merits sufficient to excuse procedural default. *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

Accordingly, the Court finds that Petitioner has procedurally defaulted these particular claims. Petitioner asserts, however, that his default should be excused because his trial and appellate counsel rendered ineffective assistance. While the ineffective assistance of counsel can "supply the cause that, together with prejudice, would excuse a procedural default," *see McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004), Petitioner cannot establish that his attorneys rendered ineffective assistance in this matter. Petitioner further asserts that his procedural

default should be excused because he has demonstrated that he is actually innocent.

To establish that counsel's performance was constitutionally deficient, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, Petitioner must further establish that counsel's performance was prejudicial in that it denied him a fair trial. *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Petitioner can satisfy neither element of this standard, however, because these particular claims are without merit.

Petitioner has failed to establish that his trial counsel's performance was constitutionally deficient. Furthermore, Petitioner has not established that he suffered prejudice as a result of any allegedly deficient performance.

The Michigan Court of Appeals examined Petitioner's allegations of prosecutorial misconduct in great detail, finding "no merit to [Petitioner's] allegations of prosecutorial misconduct." *People v. McMann*, No. 208949, Opinion at 5-8 (Mich. Ct. App., June 9, 2000). This

40

determination was reasonable and not contrary to clearly established federal law.  *See Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993); *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006).  Thus, Petitioner cannot establish that it constituted ineffective assistance for his trial counsel to fail to object to such.

Petitioner has failed to demonstrate that any statements he made to the police and which were admitted against him at trial were obtained in violation of his constitutional rights. Thus, Petitioner's appellate counsel cannot be faulted for failing to assert this claim in Petitioner's direct appeal as of right.  Furthermore, while Petitioner has identified several alleged errors on the part of his trial counsel, Petitioner has identified no evidence (either available at trial or obtained since) demonstrating that even if such alleged errors constituted deficient performance, prejudice resulted therefrom.  Petitioner's appellate counsel cannot, therefore, be faulted for failing to assert this claim in Petitioner's direct appeal as of right.

In sum, therefore, Petitioner cannot demonstrate that he was denied the effective assistance of trial or appellate counsel or that he was denied the right to a fair trial.  Thus, Petitioner cannot demonstrate cause and prejudice to overcome his procedural default.  The Court concludes, therefore, that Petitioner has procedurally defaulted these particular claims, precluding their consideration by this Court.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that McMann's petition for writ of habeas corpus be **denied**.

41

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  October 2, 2008                              /s/ Ellen S. Carmody
                                                                ELLEN S. CARMODY
                                                                United States Magistrate Judge

42